## PHILA. N. BANK v. WAREHOUSING ETC. CO.

### APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS NO. 1 OF PHILADELPHIA COUNTY.

Argued March 27, 1891—Decided April 13, 1891.

On a bill in equity for discovery and for an account, averring that the defendant, as the sales-agent for plaintiff, had secretly become interested in a purchase of plaintiff's goods and had shared with the purchaser in the profits thereof, the disputed questions being questions of fact, found by the master against the plaintiff, the decree confirming the master's report and dismissing the bill is affirmed.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 148 January Term 1891, Sup. Ct.; court below, No. 562 March Term 1889, C. P. No. 1.

On March 12, 1889, the Philadelphia National Bank filed a bill in equity against the Pennsylvania Warehousing & Safe-Deposit Co. and F. R. Pemberton. Separate answers having been filed, and issue joined, the cause was referred to *Mr. Isaac D. Yocum*, as examiner and master, who on June 2, 1890, filed a report showing a contention between the parties, in brief as follows:

In 1887, the plaintiff bank owned absolutely a large quantity of prunes previously received as collateral security for certain discounts. The prunes were stored in certain New York warehouses, and the plaintiff held the warehouse receipts. The defendant company, of which defendant Pemberton was president, was interested in certain prunes held by another warehouse company, by reason of having guaranteed loans made by the latter to the same persons whose notes had been discounted by the plaintiff bank. By arrangement between officials of the plaintiff bank and Pemberton, on behalf of the defendant company, the latter agreed to take charge of the plaintiff's prunes, to pay the duties, to weigh them, to attend to the releasing of attachments upon them, and in general to assume the entire care and custody of them and to prepare them for sale. On

Statement of Facts.

July 22, 1887, an auction sale in New York, made to feel the state of the market, disclosed the fact that a loss on the prunes was likely to be had.   On the next day, Pembérton as president of the defendant company, wrote a letter to the plaintiff bank presenting the necessity for prompt action, and proposing that his company would "continue to render its services and take the entire charge of all matters appertaining to the sale, and to guarantee all sales, for a commission of five per cent upon any sum realized."   The proposition was duly received by the plaintiff bank, and at a meeting on July 25th, the bank board by resolution "authorized the employment of the said company for this purpose."   So far, the facts were undisputed.   It was claimed by the plaintiff that the acceptance of the proposition was at once communicated to Pemberton verbally.   On the part of the latter, it was denied that any communication of the acceptance of the proposition was ever made.   It was not disputed, however, that the bank turned over to Pemberton all the warehouse receipts and papers of every description, relating to the prunes, and that the latter thereafter conducted all the correspondence, and paid all bills and traveling expenses while attending to the business.

In the spring of 1888, it became necessary for the plaintiff bank to dispose of the prunes before the heat of summer should come.   The plaintiff alleged that Pemberton then asked that one Jansen, a large wholesale dealer in New York be allowed to make a bid for them.   On the other hand, Pemberton testified that the plaintiff bank asked him to obtain a bid from Jansen.  At all events, Jansen came on from New York, but before seeing the bank officials, he asked Pemberton if the latter would take a one half interest in the prunes, if the former should buy them from the bank.   Pemberton agreed to do so.   Jansen and Pemberton then called together on the bank, and Jansen made an offer for the prunes that was declined.   Negotiations continued, however, and on May 1, 1888, a sale of the prunes to Jansen was concluded.   At this time, the plaintiff did not know that Pemberton was interested with Jansen in the purchase.   There was no evidence that he had anything to do with fixing the prices offered by Jansen before the sale was made ; and no bad faith, mismanagement, or fraud of any kind was charged or imputed to him in the care and custody of the goods.   It

was admitted that in the negotiations which finally culminated
in the sale, the bank officials retired from Pemberton's presence
to consult as to the propriety of accepting the bid presented
for Jansen. After the sale, Pemberton attended to the re-
weighing and re-coopering of the prunes, when necessary, and
to all other necessary details. Jansen paid for the prunes by
his own notes, drawn to his own order and indorsed by himself.
On July 31, 1888, Pemberton, as "president," submitted his
expense account, etc., and asked for payment thereof and for
services rendered. Payment in full was made by the plaintiff
bank on August 14, 1888. Jansen was successful in handling
and selling the prunes bought from the plaintiff, and prior to
October 6, 1888, had sold them all so as to realize a profit of
$15,553.38, of which Pemberton received one half, to wit,
$7,776.69, less the sum of $408.61 about which there was an
unsettled dispute. In February, 1889, the plaintiff bank learned
for the first time that Pemberton was interested with Jansen
in the purchase of the prunes, and filed this bill for discovery
of the amount received and for an account.

On June 2, 1890, the master filed a report in part as follows:

The facts in dispute are few. Practically the only facts in
dispute are, Was the defendant, F. R. Pemberton, notified of
the action of the board of directors of the complainant on July
25, 1887, in which they authorized the acceptance of his offer
to act as sales-agent, contained in his letter of July 23, 1887;
and did he afterwards act as sales-agent.

—Both these facts the master found against the plaintiff,
and proceeded:

Mr. Freedley, for the plaintiff, now goes a step further, and
contends that if the defendant Pemberton was, as the master
has found, the agent for the care and custody only of these
prunes, he must still account for the profit he has made. . . .

The master is well aware of the line of cases in which, where
a trust of any kind exists and is violated, it is held that the
price paid does not alter the liability to account for a profit
made. The master is of opinion, however, that this case does
not come within that line of cases.

The bank officials made up their minds to sell, against the
advice of Mr. Pemberton, and the master is unable to see what

possible difference it made to them who the purchaser was. We have here the case of an agent for the care and custody only, who did his duty faithfully and well in all that pertained to his agency, violating no confidence and betraying no trust in the performance of that duty. The principal gave its agent no confidence, and now complains that the agent did not give it his.

Having done his duty faithfully and well, the master is unable to see that he owed any duty to the complainant to disclose the fact that he was interested in the purchase. He was not possessed of any information that his principal did not possess. When the bank officials decided to sell, they conducted the negotiations themselves. They said to Mr. Pemberton, " We are going to sell," " We are going to attend to this matter ourselves," and they did. Whatever confidential relations, if any, existed or had existed were terminated then, and in their dealings with Mr. Pemberton, touching the sale, they dealt with him at arms' length and as a stranger. As appears from the testimony, Mr. Pemberton had nothing to do with fixing the price which Jansen bid, and when he changed the terms of Jansen's bid [as to time of payment] it was certainly enough to put the bank officials upon inquiry. Was it not notice to them that he had an interest in the bid? If the law goes as far as the learned counsel for the complainant says it does, the janitor of a building could not have a secret interest in its purchase.

The master has very carefully read and considered every case which was cited by the learned counsel for the complainant, and has not been able to find one that sustains him in this controversy. In every one there was a relation of confidence existing, or there was a duty imposed, the betrayal or nonperformance of which was visited with the usual penalty.

—Considering Fox v. Macreth, 1 Lead. C. in Eq., 4th Am. ed., 188; Ex parte Lacey, 6 Ves. 616; Aberdeen R. Co. v. Blakey, 1 MacQ. H. L. 471; Cumberland Coal Co. v. Sherman, 30 Barb. 553; Bane v. Brown, 56 N. Y. 288; Tait v. Williamson, L. R. 2 Ch. App. 555; York Bldg. Co. v. MacKenzie, 8 Brown P. C. 42; Beeson v. Beeson, 9 Pa. 284; Mishod v. Girod, 4 How. 533; Bartholemew v. Leech, 7 W. 472; Rankin v. Porter, 7 W. 387; Murphy v. O'Shea, 2 Jones & L. T. 422; Dart on Vendors, 42, the report continued:

The master, therefore, after a careful consideration of this case, as to the defendant Pemberton, is of the opinion that the complainant has failed to make out a case which entitles it to an accounting from him, and as to him recommends a decree dismissing the present bill with costs.

It was hoped that this would be decisive of and end the whole case; but the learned counsel for the complainant further insists that he is entitled to a decree against the defendant warehousing company, because in its answer it says that the offer contained in the letter of July 23, 1887, was accepted, and that it, through its president, Pemberton, did act as sales-agent, and that it did, in point of fact, make the sale to Jansen.

It is admitted that the corporation defendant, the principal in this case, did nothing except through its agent Pemberton, and the master having found that the said agent did not accept the agency, and did not act as agent, is now asked to find that the principal did both. This is rather an anomaly. It is, however, the fact, that the answer of the defendant corporation does say that it did act as sales-agent and did make the sale in question, and is therefore entitled to the full commission which it earned. No testimony was offered by the defendant corporation.

The master has little difficulty in dealing with this branch of the case. In the first place it is laid down as a legal principle in Daniell's Ch. Pr. & Pl., 5th ed., page 735, that a corporation answer is only a pleading. If this is true, taking into consideration what the master has decided as to the defendant Pemberton, it is an end of complainant's case, so far as the corporation defendant is concerned.

However, giving to this corporation answer the effect of an answer by an individual, has the complainant any case against it? Admitting that it did make the sale of these prunes, is the complainant entitled to a decree against it?

The answer, which must be taken as an entirety, not as partly true and partly false, says the sale was made to Jansen. If this is true, and it must for present purposes be so taken, the complainant is not entitled to a decree in its favor.

The learned counsel for the complainant contends, however, that the act of Pemberton, the president of the corporation defendant, in taking a secret interest in the purchase of the

Master's Report.

prunes, was a fraud for which the corporation itself is liable. Is this true?

It is admitted, generally speaking, that a corporation is liable for the torts or frauds of its president committed within the line of his authority, and it is contended that the corporation president, Pemberton, did so act in this case. Did the president act within the line of his authority in this case, in making the purchase in question? The master is of opinion that he did not. The act of Pemberton, the president of the corporation defendant, in writing the letter of July 23, 1887, was undoubtedly without authority from the board of directors, although afterwards ratified by the board. It certainly never authorized the taking of a secret interest in the purchase, by its president, and admittedly never received any portion of the profit realized. Had its president seen fit to enter into other private speculations for his own benefit, it certainly will not be contended that the corporation would have been liable for his acts.

The corporation defendant certainly never bought prunes before. It is not within its charter powers to do so, and the act of its president in this case was his individual act. He had no authority to make any such purchase, nor take any such interest as he did in this case. If made without authority, and the master finds he did it without authority, not being within his powers as president, the corporation is not liable to account to the complainant in this case. If made within his authority, but for his own private benefit, as he did in this case, the law is still with the defendant corporation.

The distinction is now well recognized between the act of an agent within his authority and for his master's benefit, and the act of an agent within his authority, but for his own benefit solely. In the former case the master is liable. In the latter he is not. Numerous authorities could be cited to maintain the latter proposition. Two or three only will be cited.

In British Co. v. Railway Co., 18 Q. B. Div. 714, the facts were as follows: A broker desired to buy stock of a certain corporation. He went to its secretary and asked if the stock was all right. The secretary answered that the transfers of stock were valid, and that the stock proposed to be transferred existed. It was admitted that the secretary was the proper

person to give such information.    The stock was purchased. It afterwards appeared that the stock in question was an over-issue and fraudulent, and that the secretary was interested in it and in the proceeds of its sale.    It was held that, while he was the proper person authorized to answer these inquiries, and acted within the scope of his authority, yet as he did it for his own benefit, the company was not liable.

In that case, Lord ESHER, M. R., says : " The secretary was held out by the defendant as a person to answer such questions as those put to him, in the interest of the plaintiff, and if he had answered them falsely on behalf of defendants, he being authorized to give answers for them, it may well be that they would be liable.    But, although what the secretary stated re-lated to matters about which he was authorized to give answers, he did not make the statements for the defendants, but for him-self.    He had a friend whom he desired to assist and could assist by making the false statements, and as he made them in his own interest or to assist his friend, he was not acting for the defendants.    The rule has often been expressed in the terms, that to bind the principal the agent must be acting for the benefit of the principal.    That, in my opinion, is equiva-lent to saying that he must be acting for the principal.    I know of no such case where the employer has been held liable, when his servant has made statements not for his employer, but in his own interest."    This case was cited and approved in Fried-land v. Company, 130 U. S. 426.

The general rule, said WILLIS, J., in Barwick v. Joint-stock Bank, L. R. 2 Exch. 259, 265, is that the master is answerable for every such wrong of the servant or agent as is committed in the course of the service and for the master's benefit, though no express command or privity of the master is proved.    This principle is also recognized in a very late case in Pennsylvania, that of McClung v. Dearborne, 134 Pa. 396.

The master is therefore of opinion, that, as the act of the president of the corporation, in this case, was not within his authority and was for his own benefit, the corporation defend-ant is not liable for what he did.

It was also argued that the principal in this case would only be liable for the actual amount received ; that, as it received nothing, it is liable for nothing.    Many cases, among them

Seguiñ's App., 103 Pa. 142, were cited in support of this pro-
position. While this is the law, the master has not deemed it
essential or necessary in this case to discuss it. If the master
was inclined to do so, the length of this report would restrain
him from so doing. . . . .

The master, therefore, finally reports that in his opinion the
complainant has failed to substantiate the averments contained
in the bill, and has failed to show that it is entitled to the
equitable relief prayed for. He therefore recommends that a
decree be entered as to both defendants, dismissing complain-
ant's bill with costs.

—To the report of the master the plaintiff filed thirty-five
exceptions. These exceptions having been overruled by the
master and renewed on the filing of the report, after argument
thereof before the court in banc a decree was entered dismiss-
ing the exceptions and confirming the report of the master.
Thereupon, the plaintiff took this appeal, specifying the dis-
missal of the exceptions and the confirmation of the report for
error.

*Mr. A. T. Freedley*, for the appellant.

*Mr. John G. Johnson*, for Pemberton, *Mr. Richard P. White*,
(with him *Mr. George H. Earle, Jr.*,) for the Penna. Ware-
house Company, appellees.

PER CURIAM:

A careful examination of this voluminous record has failed
to convince us that the court below erred in dismissing the ex-
ceptions to the master's report. If Pemberton had been an
agent to sell, there might have been a serious question as to
his right to become interested with Jansen in the purchase,
without disclosing such fact to his principal; but the master
has found that he was an agent for care and custody only, and
the evidence is abundant that the sale was made by the plaint-
iff, and not by Pemberton. The latter merely procured Jan-
sen to bid, at request of the plaintiff; and when the transaction
was closed and the final bid accepted, Pemberton was not even
allowed to be present. This is entirely inconsistent with the
idea that he was an agent to sell. There is really nothing in

the case but a question of fact. The appellant's view of the
law is not denied, but in the light of the findings by the mas-
ter he has no facts to which to apply it. And the elaborate
argument of his counsel has not convinced us that the master's
findings are not sustained by the evidence.

　　　　　　The decree is affirmed, and the appeal dismissed,
　　　　　　at the costs of the appellant.